UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MICHELLE WALLS, on behalf of herself and all
others similarly situated; and N.W., a minor child,
by his parent and general guardian Michelle Walls,
on behalf of himself and all others similarly situated;

        **Plaintiffs,**

   v.

BEECH-NUT NUTRITION COMPANY;
THE HAIN CELESTIAL GROUP, INC.;
NURTURE, INC. D/B/A HAPPY FAMILY
ORGANICS; GERBER PRODUCTS
COMPANY; and PLUM PBC.;

        **Defendants.**

---

Civil Action No.: 1:21-cv-00870

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

## <u>INTRODUCTION</u>

1. Plaintiffs Michelle Walls and N.W.[1] by his mother and general guardian Michelle

Walls ("Plaintiffs"), by and through their counsel, on their own behalf and on behalf of all others

similarly situated, bring this Class Action Complaint against the Defendants Beech-Nut Nutrition

Co. ("Beech-Nut"), The Hain Celestial Group, Inc. ("Hain"), Nurture, Inc. ("Nurture") d/b/a

Happy Family Organics, Gerber Products Co. ("Gerber"), and Plum Public Benefit Corp.

("Plum") (collectively, "Defendants").

2. Michelle Walls, like many parents of young and newborn children, places a

premium on only exposing her infant son, N.W., to the safest and highest quality foods available

---

[1] Plaintiff N.W. is a minor and is identified here by his initials.  *See* Fed. R. Civ. P. 5.2.

on the market.  Defendants manufactured, advertised, marketed, distributed, and sold their organic baby food as the best and healthiest options available.

3.      Accordingly, Plaintiff Walls purchased Defendants' organic baby food products and fed them to her son almost exclusively for the past six months.  Like so many parents, Walls reasonably believed that Defendants' baby foods were safe to feed to her son.

4.      But as Walls discovered two weeks ago—and as Defendants already knew—that was not the case.

5.      On February 4, 2021, the United States House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("House Subcommittee") published a bombshell report revealing that several brands of baby food—including each of the Defendants' baby food products (the "Tainted Baby Food Products")—contained significant and dangerous levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury (collectively, the "Toxic Heavy Metals").  *See* Staff of H. Subcomm. On Econ. And Consumer Policy, Comm. On Oversight and Reform, 117th Cong., *Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury,* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf  (Feb. 4, 2021) ("Subcommittee Report" or "Rept."; attached as Exhibit A).

6.      The Report noted that exposing children to toxic heavy metals causes permanent decreases in IQ, an increased risk of future criminal and antisocial behavior, and "untreatable and frequently permanent" brain damage.  This exposure has real economic consequences, as one study has shown that for each IQ point lost, a child's lifetime estimated earning capacity will decrease by over $18,000.  *See* Rept. at 9.

7.      Given the Defendants' deceptive business practices and the harms such practices have caused to countless children in New York and the United States, Plaintiffs have brought this action and seek to represent Proposed Classes (as defined herein), who, from February 17, 2015, to the present, (1) purchased for personal/household use and not resale any of Defendants' Tainted Baby Food Products; or (2) consumed Defendants' Tainted Baby Food Products.

8.      Plaintiffs' Complaint alleges claims for Defendants' violation of New York General Business Law §§ 349 and 350, unjust enrichment, intentional misrepresentation, negligent misrepresentation, fraudulent concealment, negligence, gross negligence, strict product liability, breach of express warranty, and breach of implied warranty.

9.      Plaintiffs seek injunctive and/or declaratory relief and monetary relief on behalf of the Proposed Classes including requiring the Defendants' (i) accurate disclosure of the levels of the Toxic Heavy Metals present in the baby food products sold by Defendants in their respective marketing, advertising, and labeling; (ii) testing of ingredients and final products to accurately determine the levels of Toxic Heavy Metals present in Defendants' baby food products; and (iii) restoring monies to the members of the Proposed Classes.

## PARTIES

10.     Plaintiff Michelle Walls is a resident of Staten Island, New York.  During the applicable statute of limitations period, Ms. Walls purchased Defendants' Tainted Baby Food Products that, according to the Subcommittee Report and some Defendants' internal data and documents referenced therein, were found to contain dangerous levels of Toxic Heavy Metals.

11.     Plaintiff N.W. is a one-year old child who resides with his mother and general guardian Plaintiff Michelle Walls in Staten Island, New York.  N.W. consumed the Tainted Baby Food Products manufactured and produced by Defendants that, according to the Subcommittee

Report and some Defendants' internal data and documents referenced therein, were found to contain dangerous levels of Toxic Heavy Metals.

12. Defendant Beech-Nut Nutrition Co. is a New York corporation with its principal place of business and headquarters located at One Nutritious Place, Amsterdam, New York.

13. Defendant Hain Celestial Group, Inc. is a Delaware corporation with its principal place of business and headquarters located at 111 Marcus Avenue, #1, Lake Success, New York.

14. Defendant Gerber Products Co. is a Michigan corporation with its principal place of business and headquarters located at 1812 North Moore Street, Arlington, Virginia.

15. Defendant Nurture Inc., also doing business as Happy Family Organics ("Happy Family"), is a Delaware corporation with its principal place of business and headquarters at 1 Maple Avenue, White Plains, New York.

16. Defendant Plum PBC. is a Delaware public benefit corporation with its principal place of business and headquarters located at 1485 Park Avenue, Suite 200, Emeryville, California.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of New York and Defendant Plum is a citizen of California; there are more than 100 Class Members; and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

18. Venue is proper in this judicial district under 28 U.S.C. § 1391(b). Three Defendants are headquartered in New York; each Defendant conducts substantial business in this State and judicial district through their sale of products and commercial websites; and a substantial part of the events and omissions giving rise to the alleged conduct occurred in, were directed to, and were emanated from this district.

# FACTUAL ALLEGATIONS

## I.     Congress's Investigation Reveals Elevated Levels of Toxic Heavy Metals in Defendants' Baby Food.

19.     On November 19, 2019, the U.S. House Subcommittee "requested internal documents and test results from seven of the largest manufacturers of baby food in the United States," including all of the Defendants.  Rept. at 2.

20.     Defendants Nurture, Beech-Nut, Hain, and Gerber each responded to the House Subcommittee's requests, producing "internal testing policies, test results for ingredients and/or finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits."  *Id.*

21.     Campbell Soup Co., parent corporation of Plum, refused to cooperate with the investigation.  The Subcommittee Report expressed "great[] concern" about the refusal to cooperate and that it "might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."  *Id.*

22.     As mentioned above, on February 4, 2021, the House Subcommittee published its Report, which found that baby foods produced and sold by Defendants are "tainted with significant levels" of the Toxic Heavy Metals.  *Id.*

23.     The Subcommittee Report showed that the levels of Toxic Heavy Metals present in the Tainted Baby Food Products are "multiples higher than allowed under existing regulations for other products."  For example:

a.     The federal Food and Drug Administration ("FDA") has set a maximum allowable level of **10** parts per billion ("ppb") of arsenic in drinking water. Nurture's "Happy Baby" baby food products contained as much as **180** ppb of arsenic, with over 25% of its products containing over **100** ppb, and the "typical

baby food product it sold" containing 60 ppb.  Hain's "Earth's Best Organic" baby food products contained as much as 129 ppb of arsenic, and used ingredients showing up to 309 ppb of arsenic in its products.  Hain "typically" does not test its "finished products," *i.e.*, the baby food products it sells to the public, for dangerous elements such as Toxic Heavy Metals.  Beech-Nut used ingredients that tested as high as 913.4 ppb of arsenic and "routinely" used additives that tested as high as 300 ppb of arsenic with the specific purpose of "address[ing] product characteristics such as 'crumb softness.'"  Gerber used ingredients that tested as high as 90 ppb of arsenic.  *Id.* at 3–4.

 b. The FDA has set a maximum allowable level of 5 ppb of lead in drinking water.  The FDA has set a maximum allowable level of 100 ppb of lead in candy.  *Id.* at 21-22.  Nurture sold baby food products that tested as high as 614 ppb of lead and almost 20% of its tested baby food products contained over 10 ppb.  Hain used ingredients with as much as 352 ppb of lead, eighty-eight of its ingredients tested over 20 ppb of lead, and six of its ingredients tested over 200 ppb of lead.  Beech-Nut used ingredients with as much as 886.9 ppb of lead, with four-hundred eighty-three ingredients having over 5 ppb of lead, eighty-nine having over 15 ppb of lead, and fifty-seven having over 20 ppb of lead.  Gerber used ingredients with as much as 48 ppb of lead, and "many" of its ingredients contain over 20 ppb of lead.[2]  *Id.* at 3–4.

---

[2] It is both disturbing and notable that, for comparison's sake, the 90th percentile lead level among samples collected in Flint, Michigan's water system during the Flint Water Crisis was 27 ppb.  *See* Christopher Ingraham, *This is how toxic Flint's water really is*, The Washington Post,

(continued...)

c. The FDA has set a maximum allowable level of __5__ ppb of cadmium in drinking water. Beech-Nut used one-hundred-five ingredients with over __20__ ppb, with some as high as __344.55__ ppb of cadmium. Hain used one-hundred-two ingredients with over __20__ ppb, with some as high as __260__ ppb of cadmium. Sixty-five percent of Nurture's finished and sold baby food products contained as much as __10__ ppb of cadmium. Seventy-five percent of carrots used by Gerber contained greater than 5 ppb, with some as high as __87__ ppb of cadmium. *Id.*

d. The Environmental Protection Agency ("EPA") has set a maximum allowable level of __2__ ppb of mercury in drinking water. Nurture's finished and sold baby food products contained as much as __10__ ppb of mercury. Beech-Nut and Hain do not test for mercury in their baby food products. Gerber "rarely" tests for mercury in its baby food products. *Id.* at 4.

24. The Subcommittee Report showed that Defendants, except Plum and its parent Campbell which refused to cooperate with the House Subcommittee's investigation, have staggering and stratospheric internal limits when testing baby food products or ingredients for Toxic Heavy Metals, which would often have the effect of dangerous levels in ingredients or products nonetheless "passing" Defendants' internal checks, although in some circumstances Defendants even sold baby food products in excess of their own threshold standards. For example:

---

https://www.washingtonpost.com/news/wonk/wp/2016/01/15/this-is-how-toxic-flints-water-really-is/
(Jan. 15, 2016).

a. Nurture set its internal arsenic, lead, and cadmium thresholds up to **100** ppb. Nurture's tested baby food products exceeded its own thresholds and were still sold to the public. *Id.* at 13–14, 22, 31.

b. Depending on the ingredient tested, Beech-Nut set its internal arsenic and cadmium standards between **100** and **3,000** ppb. *Id.* at 4, 17–18. Beech-Nut accepted the use of ingredients that tested as high as **913.4** ppb of arsenic, even when the internal threshold was set at 100 ppb. *Id.* at 17. Its lead threshold was up to **1,000** ppb, ten times the FDA-accepted level in candy and two-hundred times the FDA-accepted level in drinking water. *Id.* at 23.

c. Hain set its internal arsenic, lead, and cadmium standards up to **200** ppb for "some of its ingredients." As reflected above, Hain used ingredients with arsenic, lead, and cadmium contents in excess of its own internal standards, and even admitted that its internal standard was based on "theoretical calculations" and that its testing "underestimated final product toxic heavy metal levels." *Id.* at 4–5.

25. The Subcommittee Report revealed that on August 1, 2019, Hain gave a secret presentation to the FDA. The presentation revealed:

a. Testing ingredients, rather than final products, which Hain does, "underrepresent[ed]" Toxic Heavy Metal levels in its baby food products. Indeed, **100%** of tested Hain baby food products had "inorganic arsenic levels ... higher in the finished baby food than the company estimated they would be based on individual ingredient testing," with levels between 28–93% higher in finished products than ingredients. *Id.* at 5.

b.   Not only was the quantity of arsenic concerning, but the breadth of baby food inventory with elevated arsenic levels was also significant.  Hain said that half of its brown rice baby food products contained over **100** ppb of inorganic arsenic, with an average across all brown rice baby food products of **97.62** ppb.  *Id.* at 5.

c.   Hain conceded that this was not exclusively caused by naturally occurring Toxic Heavy Metals in the ingredients it used in its baby food products.  Rather, Hain said that it and other baby food producers were adding ingredients to their baby food products with high levels of Toxic Heavy Metals, including vitamin and mineral pre-mix.[3]  *Id.* at 5.

26.     The Committee's findings were disturbing on many levels—e.g., that such harmful heavy metals could be found in such substantial amounts within Defendants' organic and non-organic baby foods, the Defendants' apparent knowledge of such toxic metals in their baby foods, and their apparent failure to take any steps to protect the infants and young babies regularly ingesting such toxic metals.

27.     As noted by the Committee, babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity."  Rept. at 9.  The fact that babies are small, have other developing organ systems, and absorb more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals.  *Id.*

28.     Indeed, the FDA has declared that inorganic arsenic, lead, cadmium, and mercury are dangerous, particularly to infants and children.  *Id.*  They have "no established health benefit"

---

[3] The FDA, at the time under the direction of the Trump administration, took no new action in response to this disturbing presentation.  *See* Rept. at 5.

and "lead to illness, impairment, and in high doses, death." *Id.* "[E]ven low levels of harmful metals from individual food sources, can sometimes add up to a level of concern." *Id.* In short, infants and children are at the greatest risk of harm from toxic heavy metal exposure. *Id.*

## II.   Defendants' Deceptive, Misleading, and False Communications.

29.    Despite the disturbing results of these product and ingredient tests for Defendants' baby food products, Defendants published advertisements, communications, and product labeling that present the Tainted Baby Food Products as healthy, safe, suitable for babies, and that they help in children's development.  Below are a few examples.

30.     Hain, under the Earth's Best label, describes its baby food products as "time-trusted and safe" and that the products "are made from pure ingredients to help children grow up strong and healthy," as shown below:



http://www.hain.com/company/ (last accessed Feb. 11, 2021).

31.     Gerber says that its "Organic SmartNourish" baby food "help[s] support brain & eye development," as shown below:



https://www.behance.net/gallery/847372/Gerber-Baby-Food-tvc-print-online-outdoor (last accessed Feb. 11, 2021).

32.     On February 6, 2021, on its Facebook page, Gerber published a post that said that it "work[s] ... to make sure your baby gets the best of what nature has to offer" and that "[a]fter the harvest, we make sure that the fruits and veggies are just right for baby" as shown below:



https://www.facebook.com/Gerber (last accessed Feb. 10, 2021).

33.     On Beech-Nut's website, it says that it "conduct[s] over 20 rigorous tests on our purees, testing for up to 255 pesticides and heavy metals (like lead, cadmium, arsenic and other nasty stuff).  Just like you would, we send the produce back if it's not good enough" as shown below:



https://www.beechnut.com/our-story/ (last accessed Feb. 11, 2021) (emphasis added above).

34.    On Plum's Facebook page, on March 1, 2019, Plum said "[w]hen you buy Plum, we understand you are trusting us with your little one.  It is why we are always working hard to improve our ingredients ... leaving you with an even better product you can rely on," as shown below:



https://www.facebook.com/PlumOrganics (Mar. 1, 2019) (last accessed Feb. 12, 2021).

35.     In Nurture's Happy Family brand "Mission Report" from 2019, it claimed to "curate our ingredients and tailor our products to baby's age and stage," that it "taste[s] and thoroughly analyze[s] every batch of food and each individual ingredient that goes into our products," that it "provide[s] your little one with products that, when part of a balanced diet, help them grow healthy and strong," and that "[e]very product we make goes through a rigorous quality and safety test so you can feel confident in what you're feeding your family," as shown below:



https://2iv8kb1bv1j9j5f3leoonqg8-wpengine.netdna-ssl.com/wp-content/uploads/2018/05/HappyFamilyOrganics_2019_MissionReport_1.pdf (last accessed Feb. 12, 2021).

### III.   Plaintiff Walls Purchases the Tainted Baby Food Products for N.W.

36.     N.W., Plaintiff Walls' son, was born in 2020.

- 16 -

37.    Plaintiff Michelle Walls is a dedicated and loving mother who places a premium on ensuring her son is healthy, and consumes food that will keep him healthy, growing, and developing.

38.    In making the decision about what to feed N.W. after stopping breastfeeding, Walls saw product labels and other product communications when shopping at Target and her local grocery stores and decided to purchase Defendants' Tainted Baby Food Products, including but not limited to:

  a.    Beech-Nut "Organics Banana, Cinnamon & Granola Jar," which on its labeling and in Beech-Nut communications on its website describes the product as a "Stage 2" solid food "ideal ... for your baby around 6 months and up;"

  b.    Plum (1) "Mighty 4 Blends Banana, Blueberry, Sweet Potato, Carrot, Greek Yogurt & Millet Tots Pouch," which on its labeling and in Plum's communications on its website describes the product as containing "essential nutrients from 4 food group favorites to fuel your active tot," and (2) "Stage 2 Pear Blueberry Avocado & Granola," which on its labeling and in Plum's communications on its website describes the product as a stage "2" food appropriate for babies 6 months or older;

  c.    Nurture (1) "Happy Tot Organics Super Smart Bananas, Mangos & Spinach Pouch," which on its labeling and in Nurture's communications on its website describes the product as one that "[n]ourish[es] your growing tot" and "help[s] support brain health ... making this pouch perfect for wholesome, on-the-go eating," and (2) "Happy Baby Organics Apples, Blueberries & Oats," which on its labeling and in Nurture's communications on its website describes the product as a "Stage 2" food suited to babies 6 months or older;

- 17 -

    d.   Gerber (1) "Yogurt Melts," which on its labeling describes the product as a food suitable to babies 8 months or older and in product description supplied on Target's website says that "these snacks combine the delicious taste little ones love with the wholesome nutrition parents love," and (2) "Oatmeal Banana", which on its labeling and in Gerber's communications on its website describes the product as an appropriate "2nd Food" for "Sitter" babies and that "Following Clean Field Farming[] practices, we keep our grains safe and wholesome from farm to kitchen;" and

    e.   Hain (1) "Earth's Best Apple Sunny Days Snack Bars," which on its website describes the product as a snack suitable for children 2 years or older, and (2) "Earth's Best Blueberry Breakfast Biscuits," which on its website describes the product as a snack suitable for children 2 years or older.

39.    Walls, relying on their representations and reputations, trusted Defendants as baby food sellers, and considered Defendants' baby food, and especially their organic baby food, to be the "gold standard."

40.    Walls purchased the Tainted Baby Food Products from July 2020 to February 2021, and later fed such Tainted Baby Food Products to her son N.W.

41.    Walls believed that the Tainted Baby Food Products were safe and healthy, relying on Defendants' reputations, labels, marketing, and communications.

42.    As N.W. grew, Walls became concerned that he was not hitting certain "developmental benchmarks," including but not limited to: walking, imitating others, verbalization, and pointing.  N.W. also has outbursts where he wildly thrashes.  She had no reason to believe the organic baby food products she had been purchasing from Defendants could be the cause, having paid a premium to buy baby food she believed to be safer and healthier than their competitors.

43.     On or around February 6, 2021, Walls saw media coverage of the Subcommittee Report.  Shocked by what she read, she immediately stopped feeding N.W. the Tainted Baby Food Products and returned the remaining products she still had.

44.     On or about February 11, 2021, Walls requested that N.W.'s physician order a heavy metals blood tests for N.W., which would detect levels of the Toxic Heavy Metals in his blood.  It is unusual to need to order a blood test for a one-year-old, and especially unusual, difficult, and distressing to draw the seven vials of blood necessary to run a panel of toxic heavy metal blood tests.  Walls is in the process of arranging a safe and appropriate schedule of blood draws for N.W. for these tests.

45.     Walls is also arranging for N.W. to receive "early intervention" special education services, as she tries to understand what N.W. will need as far as educational, social, and medical services in order to help close the gaps of his developmental delays, and any other delays or conditions that may arise as a result of his consumption of elevated levels of Toxic Heavy Metals in the Tainted Baby Food Products.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs request certification pursuant to Rule 23(b)(2) and (b)(3) of ten proposed injunctive and/or declaratory relief and damages classes, respectively, or sub-classes in the alternative, as laid out below:

47.     All persons within the United States who purchased Beech-Nut's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Beech-Nut, any entity in which Beech-Nut has a controlling interest, Beech-Nut's officers, directors, legal representatives,

successors, and assigns, and persons who purchased Beech-Nut's Tainted Baby Food Products for the purpose of resale (the "National Beech-Nut Purchaser Class");[4]

48.     All persons within the United States who purchased Hain's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Hain, any entity in which Hain has a controlling interest, Hain's officers, directors, legal representatives, successors, and assigns, and persons who purchased Hain's Tainted Baby Food Products for the purpose of resale (the "National Hain Purchaser Class");[5]

49.     All persons within the United States who purchased Gerber's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Gerber, any entity in which Gerber has a controlling interest, Gerber's officers, directors, legal representatives, successors, and

---

[4] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who purchased Beech-Nut's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Beech-Nut, any entity in which Beech-Nut has a controlling interest, Beech-Nut's officers, directors, legal representatives, successors, and assigns, and persons who purchased Beech-Nut's Tainted Baby Food Products for the purpose of resale (the "New York Beech-Nut Purchaser Sub-Class").

[5] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who purchased Hain's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Hain, any entity in which Hain has a controlling interest, Hain's officers, directors, legal representatives, successors, and assigns, and persons who purchased Hain's Tainted Baby Food Products for the purpose of resale (the "New York Hain Purchaser Sub-Class").

assigns, and persons who purchased Gerber's Tainted Baby Food Products for the purpose of resale (the "National Gerber Purchaser Class");[6]

50.     All persons within the United States who purchased Plum's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Plum, any entity in which Plum has a controlling interest, Plum's officers, directors, legal representatives, successors, and assigns, and persons who purchased Plum's Tainted Baby Food Products for the purpose of resale (the "National Plum Purchaser Class");[7]

51.     All persons within the United States who purchased Nurture's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Nurture, any entity in which Nurture has a controlling interest, Nurture's officers, directors, legal representatives, successors,

---

[6] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who purchased Gerber's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Gerber, any entity in which Gerber has a controlling interest, Gerber's officers, directors, legal representatives, successors, and assigns, and persons who purchased Gerber's Tainted Baby Food Products for the purpose of resale (the "New York Gerber Purchaser Sub-Class").

[7] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who purchased Plum's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Plum, any entity in which Plum has a controlling interest, Plum's officers, directors, legal representatives, successors, and assigns, and persons who purchased Plum's Tainted Baby Food Products for the purpose of resale (the "New York Plum Purchaser Sub-Class").

and assigns, and persons who purchased Nurture's Tainted Baby Food Products for the purpose of resale (the "National Nurture Purchaser Class");[8]

52.     All persons within the United States who consumed Beech-Nut's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Beech-Nut, any entity in which Beech-Nut has a controlling interest, and Beech-Nut's officers, directors, legal representatives, successors, and assigns (the "National Beech-Nut Child Class");[9]

53.     All persons within the United States who consumed Hain's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Hain, any entity in which Hain has a controlling interest, and Hain's officers, directors, legal representatives, successors, and assigns (the "National Hain Child Class");[10]

---

[8] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who purchased Nurture's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Nurture, any entity in which Nurture has a controlling interest, Nurture's officers, directors, legal representatives, successors, and assigns, and persons who purchased Nurture's Tainted Baby Food Products for the purpose of resale (the "New York Nurture Purchaser Sub-Class").

[9] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who consumed Beech-Nut's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Beech-Nut, any entity in which Beech-Nut has a controlling interest, and Beech-Nut's officers, directors, legal representatives, successors, and assigns (the "New York Beech-Nut Child Sub-Class").

[10] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who consumed Hain's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Hain, any entity in which Hain has a controlling interest, and Hain's officers, directors, legal representatives, successors, and assigns (the "New York Hain Child Sub-Class").

54.     All persons within the United States who consumed Gerber's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Gerber, any entity in which Gerber has a controlling interest, and Gerber's officers, directors, legal representatives, successors, and assigns (the "National Gerber Child Class");[11]

55.     All persons within the United States who consumed Plum's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Plum, any entity in which Plum has a controlling interest, and Plum's officers, directors, legal representatives, successors, and assigns (the "National Plum Child Class");[12] and

56.     All persons within the United States who consumed Nurture's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Nurture, any entity in which

---

[11] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who consumed Gerber's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Gerber, any entity in which Gerber has a controlling interest, and Gerber's officers, directors, legal representatives, successors, and assigns (the "New York Gerber Child Sub-Class").

[12] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who consumed Plum's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Plum, any entity in which Plum has a controlling interest, and Plum's officers, directors, legal representatives, successors, and assigns (the "New York Plum Child Sub-Class").

Nurture has a controlling interest, and Nurture's officers, directors, legal representatives, successors, and assigns (the "National Nurture Child Class").[13]

57.     The National Beech-Nut Purchaser Class, National Hain Purchaser Class, National Gerber Purchaser Class, National Plum Purchaser Class, and National Nurture Purchaser Class, or in the alternative their New York Sub-Class facsimiles, are referred to as the "National Purchaser Classes."

58.     The National Beech-Nut Child Class, National Hain Child Class, National Gerber Child Class, National Plum Child Class, and National Nurture Child Class, or in the alternative their New York Sub-Class facsimiles, are referred to as the "National Child Classes."

59.     The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide damages and injunctive and/or declaratory relief.

60.     There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent.  Such common questions predominate over questions affecting only individual members of the Class(es).  These include but are not limited to:

      a.   Whether each Defendant's Tainted Baby Food Products contain elevated and/or dangerous levels of Toxic Heavy Metals;

---

[13] In the alternative, Plaintiffs request certification of a class defined by all persons within the State of New York who consumed Nurture's Tainted Baby Food Products from the beginning of any applicable limitations period through the date of class certification, excluding the judge or magistrate assigned to this case, Nurture, any entity in which Nurture has a controlling interest, and Nurture's officers, directors, legal representatives, successors, and assigns (the "New York Nurture Child Sub-Class").

b.   Whether each Defendant knew or should have known that their Tainted Baby Food Products contain elevated and/or dangerous levels of Toxic Heavy Metals;

c.   Whether each Defendant represented and continues to represent that its Tainted Baby Food Products were healthy, safe, suitable for babies, and/or that they help in a child's development;

d.   Whether each Defendant's representations in marketing, advertising, packaging, labeling, and other promotional materials for the Tainted Baby Food Products are false, deceptive, or misleading;

e.   Whether each Defendant represented and continues to represent that the manufacturing of the Tainted Baby Food Products is subjected to rigorous testing and quality standards;

f.   Whether Defendants' Tainted Baby Food Products are subjected to reasonable testing and quality standards;

g.   Whether each Defendant's representations were likely to deceive a reasonable consumer;

h.   Whether each Defendant knew or recklessly disregarded that its representations were false, deceptive, or misleading;

i.   Whether each Defendant continued to make such representations despite knowing that such representations were false, deceptive, or misleading;

j.   Whether a representation that a baby food product is healthy, safe, suitable for babies, and/or that it helps in children's development is material to a reasonable consumer;

k.   Whether Defendants violated New York General Business Law §§ 349 or 350;

- 25 -

l.   Whether Defendants fraudulently concealed elevated and/or dangerous levels of Toxic Heavy Metals in the Tainted Baby Food Products;

m.   Whether Defendants expressly or impliedly warranted that their Tainted Baby Food Products are healthy, safe, appropriate to feed to children, and/or that their testing protocols ensure the Tainted Baby Food Products exclude ingredients that are unsafe;

n.   Whether Plaintiffs and Members of the Class(es) used the Tainted Baby Food Products for their intended or ordinary purpose;

o.   Whether Defendants were unjustly enriched at the expense of the Class(es);

p.   Whether Defendants owed a duty of care to the National Purchaser Classes;

q.   Whether Defendants owed a duty of care to the National Child Classes;

r.   Whether Defendants breached their duties of care by allowing the Tainted Baby Food Products to be sold and consumed when they contained and contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals;

s.   Whether Defendants breached their duty of care by failing to take any remedial step to prevent the consumption of the Tainted Baby Food Products, which are still available for sale;

t.   Whether Defendants' breaches of their duties caused injury to the Class(es);

u.   Whether Defendants' conduct in breach of their duties was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class(es);

v.   Whether Defendants' designed and manufactured their respective Tainted Baby Food Products in a manner that posed a substantial likelihood of harm;

w.  Whether it was feasible for Defendants to design their respective Tainted Baby Food Products in a safer manner without impairing the usefulness or desirability of the product to users and without creating an equal or greater risk of harm; and

x.  Whether Plaintiffs and Members of the Class(es) were damaged by Defendants' conduct.

61.  The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by members of the Class(es).

62.  Plaintiff Class(es) representatives will fairly and adequately protect the interests of the Plaintiff Class(es) members.  Plaintiffs' counsel are unaware of any conflict of interest between the Class(es) representatives and absent Class(es) members with respect to the matters at issue in this litigation; the Class(es) representatives will vigorously prosecute the suit on behalf of the Class(es); and the Class(es) representatives are represented by experienced counsel.  Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving unfair or deceptive acts and practices and product liability.

63.  Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class(es).

64.  The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice.  Moreover, the prosecution of separate actions by individual members of the Class(es) could result in inconsistent or varying adjudications with respect to individual members of the Class(es) and/or one or more of the Defendants.

65.  Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating injunctive relief for the Class(es).

## CAUSES OF ACTION

### Count I
### Unjust Enrichment
### (on behalf of Michelle Walls and the National Purchaser Classes)

66.     Plaintiffs, individually and on behalf of the respective National Purchaser Classes, repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

67.     Substantial benefits have been conferred on Defendants by Plaintiffs and the respective National Purchaser Classes, through the purchase of the Tainted Baby Food Products. Defendants knowingly and willfully accepted and enjoyed these benefits.

68.     Defendants either knew or should have known that the payments rendered by Plaintiffs and the respective National Purchaser Classes were given and received with the expectation that the Tainted Baby Food Products would have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendants.  As such, it would be inequitable for Defendants to retain the benefit of these payments under the circumstances.

69.     Defendants' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and the respective National Purchaser Classes.

70.     Plaintiffs and the respective National Purchaser Classes are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

71.     Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

72.     Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

73.     Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

74.     Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

75.     Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>Count II</u>
<u>Fraudulent Concealment</u>
<u>(on behalf of Michelle Walls and the National Purchaser Classes)</u>

76.     Plaintiffs, individually and on behalf of the respective National Purchaser Classes repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

77.     Defendants concealed and failed to disclose the fact that the Tainted Baby Food Products contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.

78.     Defendants' respective misrepresentations were contained in product labels, advertisements, and communications that were viewed by Plaintiff Walls and the respective National Purchaser Classes prior to purchasing the Tainted Baby Food Products.

79.     Defendants had a duty to disclose that the Tainted Baby Food Products contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.  Defendants had superior knowledge or means of knowledge not readily available to Plaintiff Walls and members of the respective National Purchaser Classes and knew that the respective National Purchaser Classes were acting on the basis of Defendants' representations and omissions.

80.     Defendants' concealments were material because parents are concerned with the health of their babies and their food-purchasing decisions would be influenced by Defendants' claims.  If Defendants had not omitted the aforementioned, facts, Plaintiff Walls and the respective National Purchaser Classes would not have paid a premium for the Tainted Baby Food Products, or purchased them at all.

81.     Defendants knew or recklessly disregarded that its representations were false when made because, among other things, they were in possession of ingredient and/or final product test results for Toxic Heavy Metal levels, which showed that many of the ingredients Defendants used and Tainted Baby Food Products Defendants sold, contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.

82.     Defendants fraudulently concealed the above-mentioned information with the intent to deceive purchasers of the Tainted Baby Food Products, like Plaintiff Walls and the respective National Purchaser Classes in order to boost sales.

83. Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' reputations in purchasing the Tainted Baby Food Products.

84. As a result of their reliance, Plaintiff Walls and the respective National Purchaser Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

85. Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Walls and the respective National Purchaser Classes.

86. Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

87. Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

88. Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

89. Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

90. Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>Count III</u>
<u>Intentional Misrepresentation</u>
<u>(on behalf of Michelle Walls and the National Purchaser Classes)</u>

91.      Plaintiffs, individually and on behalf of the respective National Purchaser Classes repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

92.      Defendants concealed and failed to disclose the fact that the Tainted Baby Food Products contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and/or that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.

93.      Defendants' misrepresentations were contained in product labels, advertisements, and communications that were viewed by Plaintiff Walls and the respective National Purchaser Classes prior to purchasing the Tainted Baby Food Products.

94.       Defendants' concealments were material because parents are concerned with the health of their babies and their food-purchasing decisions would be influenced by Defendants' claims.  If Defendants had not omitted the aforementioned, facts, Plaintiff Walls and the respective National Purchaser Classes would not have purchased the Tainted Baby Food Products.

95.      Defendants knew or recklessly disregarded that its representations were false when made because, among other things, they were in possession of ingredient and/or final product test results for Toxic Heavy Metal levels, which showed that many of the ingredients Defendants used and Tainted Baby Food Products Defendants sold contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.

- 32 -

96.     Defendants fraudulently concealed the above-mentioned information with the intent to deceive purchasers of the Tainted Baby Food Products, like Plaintiff Walls and the respective National Purchaser Classes in order to boost sales.

97.     Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' reputations in purchasing the Tainted Baby Food Products.

98.     As a result of their reliance, Plaintiff Walls and the respective National Purchaser Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

99.     Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff Walls and the respective National Purchaser Classes.

100.    Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

101.    Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

102.    Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

103.    Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

104.    Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## Count IV
## Negligent Misrepresentation
## (on behalf of Michelle Walls and the National Purchaser Classes)

105.    Plaintiffs, individually and on behalf of the respective National Purchaser Classes repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

106.    As alleged above, Defendants misrepresented by omission that the Tainted Baby Food Products contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, that they were not healthy or safe for children to consume, and that their testing practices did not result in the exclusion of ingredients or final products with elevated and/or dangerous levels of Toxic Heavy Metals.

107.    Defendants' misrepresentations were made in the course of a business transaction (the advertisement, sale, and purchase of the Tainted Baby Food Products) in which both Plaintiff Walls and the respective National Purchaser Classes and Defendants have a pecuniary interest.

108.    Defendants knew or should have known that these representations were false or misleading and failed to exercise reasonable care in disseminating the information contained in its advertisements and communications.

109.    Defendants knew or should have known that these representations would induce customers like Plaintiff Walls and the respective National Purchaser Classes into purchasing the Tainted Baby Food Products.

110.    Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' reputations in purchasing the Tainted Baby Food Products.

111.     As a result of their reliance, Plaintiff Walls and the respective National Purchaser Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

112.     Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

113.     Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

114.     Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

115.     Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

116.     Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## Count V
## Violation of New York's Deceptive Acts & Practices Law, N.Y. Gen. Bus. Law § 349
### (on behalf of Michelle Walls and the National Purchaser Classes)

117.     Plaintiffs, individually and on behalf of the respective National Purchaser Classes repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

118.     In their respective sales of goods throughout New York, Defendants conduct business and trade within the meaning of N.Y. Gen. Bus. Law § 349.

119.     Plaintiff Walls and the respective National Purchaser Classes are consumers who purchased products from Defendants.

120.     Defendants violated N.Y. Gen. Bus. Law § 349 by representing that their Tainted Baby Food Products were healthy, safe, appropriate to feed to children, and/or that their testing protocols ensure the Tainted Baby Food Products exclude ingredients that are unsafe.  This was deceptive because the Tainted Baby Foods contained, or had a risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals, and Defendants' testing protocols did not ensure the Tainted Baby Food Products exclude ingredients that are unsafe.

121.     Defendants intentionally represented that the Tainted Baby Food Products were of a particular standard, grade, or quality when they were in fact adulterated and not fit for consumption by babies.

122.     The facts concealed, misrepresented, and/or omitted by Defendants were material in that Plaintiff Walls and the respective National Purchaser Classes and any reasonable consumer would have considered them when deciding whether to purchase the Tainted Baby Food Products.

123.     Defendants' conduct and omissions described herein repeatedly occurred in the course of Defendants' business and were capable of deceiving a substantial portion of the consuming public.

124.     Defendants engaged and continue to engage in deceptive conduct in violation of the New York General Business Law.

125.     Defendants' misrepresentations, omissions, and deceptive acts or practices resulted in Plaintiff Walls and the respective National Purchaser Classes suffering actual damages when they purchased the Tainted Baby Food Products that were worth less than the price paid and that

they would not have purchased had they known of the presence, or risk of presence, of elevated and/or dangerous levels of Toxic Heavy Metals that did not conform to the packaging.

126.     Defendants intended for Plaintiff Walls and the respective National Purchaser Classes to rely on their deceptive misrepresentations and omissions when purchasing their Tainted Baby Food Products.

127.     As a result of their reliance, Plaintiff Walls and the respective National Purchaser Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

128.     Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

129.     Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

130.     Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

131.     Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

132.     Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>Count VI</u>
<u>Violation of New York's False Advertising Law, N.Y. Gen. Bus. Law § 350</u>
<u>(on behalf of Michelle Walls and the National Purchaser Classes)</u>

133.    Plaintiffs, individually and on behalf of the respective National Purchaser Classes repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

134.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

135.    Pursuant to N.Y. Gen. Bus. Law § 350, false advertising is defined as "advertising, including labeling, or a commodity ... if such advertising is misleading in a material respect."

136.    Defendants' claims that their Tainted Baby Food Products were, *inter alia*, "healthy," "safe," subject to "rigorous tests" and/or they "send the produce back if it's not good enough," "curat[ed] [] ingredients and tailor[ed] [] products to baby's age and stage," and/or consumers "can rely on" their ingredients, were literally false and likely to deceive the public.

137.    Defendants' claims were untrue or misleading because such claims failed to disclose that the Tainted Baby Food Products contained elevated and/or dangerous levels, or risk thereof, of Toxic Heavy Metals in the ingredients for and/or final Tainted Baby Food Products, thus making them neither healthy nor safe nor made of ingredients "curated" or "tailored" for babies, and that Defendants' testing protocols could not be relied on and did not result in the exclusion of risky or dangerous ingredients.

138.    Defendants knew or should have known that such claims were false or misleading.

139.    Such false or misleading claims and representations made by Defendants were material in that Plaintiff Walls and the respective National Purchaser Classes and any reasonable consumer would have considered them when deciding whether to purchase the Tainted Baby Food Products.

140.    Defendants, including their agents and distributors, made untrue, deceptive, and misleading assertions, representations, or omissions about the alleged quality, characteristics, and nature of the Tainted Baby Food Products.

141.    Defendants' misrepresentations, omissions, and deceptive acts or practices resulted in Plaintiff Walls and the respective National Purchaser Classes suffering actual damages when they purchased the Tainted Baby Food Products that were worth less than the price paid and that they would not have purchased had they known of the presence, or risk of presence, of elevated and/or dangerous levels of Toxic Heavy Metals that did not conform to the packaging.

142.    Defendants intended for Plaintiff Walls and the respective National Purchaser Classes to rely on their deceptive misrepresentations and omissions when purchasing their Tainted Baby Food Products.

143.    As a result of their reliance, Plaintiff Walls and the respective National Purchaser Classes have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase.

144.    Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

145.    Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

146.    Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

147.    Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

148.    Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### Count VII
### Breach of Express Warranty
### (on behalf of Michelle Walls and the National Purchaser Classes)

149.    Plaintiffs, individually and on behalf of the Class(es), repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

150.    Defendants marketed and sold the Tainted Baby Food Products into the stream of commerce with the intent that they would be purchased by Plaintiff Walls and the National Purchaser Classes.

151.    Defendants expressly warranted, advertised, and represented to Plaintiff Walls and the respective National Purchaser Classes that their Tainted Baby Food Products are healthy, safe, appropriate to feed to children, and that their testing protocols ensure the Tainted Baby Food Products exclude ingredients that are unsafe.

152.    Defendants made these express warranties regarding the Tainted Baby Food Products' quality, ingredients, and fitness for consumption in writing through their websites, advertisements, marketing materials, packaging, and labels.  These express warranties became part of the basis of the bargain that Plaintiffs and the respective National Purchaser Classes entered into upon purchasing the Tainted Baby Food Products.

153.    Defendants' advertisements, warranties, and representations were made in connection with the sale of the Tainted Baby Food Products to Plaintiff Walls and the respective National Purchaser Classes.

154.    Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' advertisements, warranties, and representations regarding the Tainted Baby Food Products in deciding whether to purchase Defendants' products.

155.    Defendants were on notice of this breach as they were aware of the elevated and/or dangerous levels, or risk thereof, of Toxic Heavy Metals in the ingredients for and/or final Tainted Baby Food Products.

156.    The Tainted Baby Food Products' defect, i.e., the elevated and/or dangerous levels, or risk thereof, of Toxic Heavy Metals, existed when Defendants delivered the Tainted Baby Food Products to Plaintiff Walls and the respective National Purchaser Classes by placing them in the stream of commerce.

157.    Privity exists because Defendants expressly warranted to Plaintiff Walls and the respective National Purchaser Classes through the warranting, packaging, advertising, marketing, and labeling that the Tainted Baby Food Products are healthy, safe, appropriate to feed to children, and/or that their testing protocols ensure the Tainted Baby Food Products exclude ingredients that are unsafe.

158.    Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' warranties in purchasing the Tainted Baby Food Products.

159.    Plaintiff Walls and the respective National Purchaser Classes purchased and used the Tainted Baby Food Products for their intended purpose, i.e., feeding them to children.

160.    As a direct and proximate result of Defendants' breaches, the respective National Purchaser Classes suffered damages, past, present, and future, by undertaking appropriate

remedial measures, including but not limited to medical monitoring and medical, educational, and social interventions for their children to offset the effects of elevated Toxic Heavy Metals levels in their children.

161.    Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

162.    Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

163.    Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

164.    Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

165.    Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**Count VIII**
**Breach of Implied Warranty of Merchantability**
**(on behalf of Michelle Walls and the National Purchaser Classes)**

166.    Plaintiffs, individually and on behalf of the Class(es), repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

167.    Defendants are merchants engaging in the sale of goods to Plaintiff Walls and the respective National Purchaser Classes.

168.    There were sales of goods from Defendants to Plaintiff Walls and the respective National Purchaser Classes.

169.    At all times mentioned herein, Defendants manufactured or supplied the Tainted Baby Food Products, and prior to the time the Tainted Baby Food Products were purchased by Plaintiff Walls and the respective National Purchaser Classes, Defendants impliedly warranted to them that the Tainted Baby Food Products were of merchantable quality, fit for their ordinary use, i.e., consumption by babies, and conformed to the promises and affirmations of fact made on the Tainted Baby Food Products' containers and labels, including that the food was healthy, safe, and/or appropriate for babies to consume.  Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' promises and affirmations of fact when they purchased the Tainted Baby Food Products.

170.    The Tainted Baby Food Products were not fit for their ordinary use, consumption by babies, and did not conform to Defendants' affirmations of fact and promises because they contained, or were at risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals that do not conform to the packaging.

171.    Defendants breached their implied warranties by selling Tainted Baby Food Products that failed to conform to the promises or affirmations of fact made on the container or label as each product contained, or had the risk of containing, elevated and/or dangerous levels of Toxic Heavy Metals that do not conform to the packaging.

172.    Defendants were on notice of this breach, as they were aware of the elevated and/or dangerous levels, or risk thereof, of Toxic Heavy Metals in the Tainted Baby Food Products and their own internal testing processes.

173.    Privity exists because Defendants impliedly warranted to Plaintiff Walls and the respective National Purchaser Classes through the warranting, packaging, advertising, marketing,

- 43 -

and labeling that the Tainted Baby Food Products are healthy, safe, appropriate to feed to children, and/or that their testing protocols ensure the Tainted Baby Food Products exclude ingredients that are unsafe.

174. The Tainted Baby Food Products' defect, i.e., the elevated and/or dangerous levels, or risk thereof, of Toxic Heavy Metals, existed when Defendants delivered the Tainted Baby Food Products to Plaintiff Walls and the respective National Purchaser Classes by placing them in the stream of commerce.

175. Plaintiff Walls and the respective National Purchaser Classes relied on Defendants' warranties in purchasing the Tainted Baby Food Products.

176. Plaintiff Walls and the respective National Purchaser Classes purchased and used the Tainted Baby Food Products for their intended purpose, i.e., feeding them to children, within the implied warranty period.

177. As a direct and proximate result of Defendants' breaches of their duties, the respective National Purchaser Classes suffered damages, past, present, and future, by undertaking appropriate remedial measures, including but not limited to medical monitoring and medical, educational, and social interventions for their children to offset the effects of elevated Toxic Heavy Metals levels in their children.

178. Plaintiffs and the National Beech-Nut Purchaser Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

179. Plaintiffs and the National Hain Purchaser Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

180.     Plaintiffs and the National Gerber Purchaser Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

181.     Plaintiffs and the National Plum Purchaser Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

182.     Plaintiffs and the National Nurture Purchaser Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>Count IX</u>
<u>Negligence</u>
<u>(on behalf of all Plaintiffs and Classes)</u>

183.     Plaintiffs, individually and on behalf of the Class(es), repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

184.     Defendants had a duty to Plaintiffs and the Class(es) to exercise reasonable and ordinary care in the formulation, testing, manufacture, marketing, distribution and sale of the Tainted Baby Food Products.

185.     Defendants breached their duties to the Class(es), by allowing the Tainted Baby Food Products to be sold and consumed when they contained and contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals.

186.     Defendants, knowing the Tainted Baby Food Products contained and contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals, had a duty to act reasonably to remediate the hazard these products posed to babies who consumed them by, *inter alia,* publishing accurate and reasonable warnings or issuing product recalls.

- 45 -

187.    Defendants breached their duties by failing to take any remedial step to prevent the consumption of the Tainted Baby Food Products, which are still available for sale.

188.    As a direct and proximate result of Defendants' breaches of their duties, Plaintiff Walls and the respective National Purchaser Classes were forestalled from undertaking effective and immediate remedial measures, including stopping feeding their children the Tainted Baby Food Products, medical monitoring, and medical, educational, and social interventions for their children to offset the effects of elevated Toxic Heavy Metals levels in their blood.

189.    As a direct and proximate result of Defendants' breaches of their duties, the respective National Child Classes suffered damages, past, present, and future, including but not limited to:

    a.   Serious and in some cases irreversible bodily injury;

    b.   Substantial economic losses from medical expenses, lost wages, lost income, and lost or impaired earning capacity; and

    c.   Pain and suffering.

190.    Plaintiffs and the National Beech-Nut Purchaser Class and National Beech-Nut Child Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

191.    Plaintiffs and the National Hain Purchaser Class and National Hain Child Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

192.    Plaintiffs and the National Gerber Purchaser Class and National Gerber Child Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

193. Plaintiffs and the National Plum Purchaser Class and National Plum Child Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

194. Plaintiffs and the National Nurture Purchaser Class and National Nurture Child Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**Count X**
**Gross Negligence**
**(on behalf of all Plaintiffs and Classes)**

195. Plaintiffs, individually and on behalf of the Class(es), repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

196. Defendants had a duty to Plaintiffs and the Class(es) to exercise reasonable and ordinary care in the formulation, testing, manufacture, marketing, distribution and sale of the Tainted Baby Food Products.

197. Defendants breached their duties to the Class(es), by allowing the Tainted Baby Food Products to be sold and consumed when they contained and contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals.

198. Defendants, knowing the Tainted Baby Food Products contained and contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals, had a duty to act reasonably to remediate the hazard these products posed to babies who consumed them by, *inter alia*, publishing accurate and reasonable warnings or issuing product recalls.

199. Defendants breached their duties by failing to take any remedial step to prevent the consumption of the Tainted Baby Food Products, which are still available for sale.

200. Defendants conduct was so reckless as to demonstrate a substantial lack of concern for whether injury would result to Plaintiffs or the Class(es).

201.    As a direct and proximate result of Defendants' breaches of their duties, the respective National Purchaser Classes suffered damages, past, present, and future, because they were forestalled from undertaking effective and immediate remedial measures, including stopping feeding their children the Tainted Baby Food Products, medical monitoring, and medical, educational, and social interventions for their children to offset the effects of elevated Toxic Heavy Metals levels in their blood.

202.    As a direct and proximate result of Defendants' breaches of their duties, the respective National Child Classes suffered damages, past, present, and future, including but not limited to:

      a.   Serious and in some cases irreversible bodily injury;

      b.   Substantial economic losses from medical expenses, lost wages, lost income, and lost or impaired earning capacity; and

      c.   Pain and suffering.

203.    Plaintiffs and the National Beech-Nut Purchaser Class and National Beech-Nut Child Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

204.    Plaintiffs and the National Hain Purchaser Class and National Hain Child Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

205.    Plaintiffs and the National Gerber Purchaser Class and National Gerber Child Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

206.    Plaintiffs and the National Plum Purchaser Class and National Plum Child Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

207.    Plaintiffs and the National Nurture Purchaser Class and National Nurture Child Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

<u>Count XI</u>
<u>Strict Product Liability</u>
<u>(on behalf of all Plaintiffs and Classes)</u>

208.    Plaintiffs, individually and on behalf of the Class(es), repeat and reallege all previously alleged paragraphs, as if fully alleged herein.

209.    New York law recognizes a strict product liability claim for defectively designed products, ones which, at the time they leave the seller's hands, are in a condition not reasonably contemplated by the ultimate consumer and are unreasonably dangerous for their intended use, ones whose utility does not outweigh the danger inherent in their introduction into the stream of commerce.

210.    Defendants designed and manufactured the Tainted Baby Food Products in a manner that posed a substantial likelihood of harm, in particular because, *inter alia*:

211.    The Tainted Baby Food Products contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals;

212.    The ingredients used to manufacture the Tainted Baby Food Products contain, or risk containing, elevated and/or dangerous levels of Toxic Heavy Metals; and

213.    Defendants' testing protocols for Toxic Heavy Metals in ingredients and/or Tainted Baby Food Products set dangerously high thresholds for Toxic Heavy Metal levels and, even so,

did not result in the exclusion of ingredients or the recall of Tainted Baby Food Products with elevated and/or high levels of Toxic Heavy Metals.

214.    It was feasible for Defendants to design the Tainted Baby Food Products in a safer manner without impairing the usefulness or desirability of the product to users and without creating an equal or greater risk of harm, in particular because, *inter alia*:

     a.  Defendants could have excluded ingredients with elevated and/or dangerous levels of Toxic Heavy Metals that were likely to transmit those Toxic Heavy Metals at elevated and/or dangerous levels into the Tainted Baby Food Products;

     b.  Defendants could have tested all Tainted Baby Food Products in order to identify and not sell inventory with elevated and/or dangerous levels of Toxic Heavy Metals;

     c.  Defendants could have testing protocols consistent with their stated goal of selling healthy and safe baby food to the consuming public, i.e., lower thresholds; and

     d.  Defendants could enforce and follow the thresholds that they set.

215.    Plaintiff Walls and the respective National Purchaser Classes purchased and used the Tainted Baby Food Products for their intended purpose, i.e., feeding them to children.

216.    As a direct and proximate result of Defendants' breaches of their duties, the respective National Purchaser Classes suffered damages, past, present, and future, by undertaking appropriate remedial measures, including but not limited to stopping feeding their children the Tainted Baby Food Products, medical monitoring, and medical, educational, and social interventions for their children to offset the effects of elevated Toxic Heavy Metals levels in their children.

217.     Plaintiff N.W. and the respective National Child Classes used the Tainted Baby Food Products for their intended purpose, i.e., consuming them.

218.     As a direct and proximate result of Defendants' breaches of their duties, the respective National Child Classes suffered damages, past, present, and future, including but not limited to:

    a.   Serious and in some cases irreversible bodily injury;

    b.   Substantial economic losses from medical expenses, lost wages, lost income, and lost or impaired earning capacity; and

    c.   Pain and suffering.

219.     Plaintiffs and the National Beech-Nut Purchaser Class and National Beech-Nut Child Class seek against Beech-Nut actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

220.     Plaintiffs and the National Hain Purchaser Class and National Hain Child Class seek against Hain actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

221.     Plaintiffs and the National Gerber Purchaser Class and National Gerber Child Class seek against Gerber actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

222.     Plaintiffs and the National Plum Purchaser Class and National Plum Child Class seek against Plum actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

223.     Plaintiffs and the National Nurture Purchaser Class and National Nurture Child Class seek against Nurture actual damages and injunctive relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief and judgment against each Defendant as to each and every count, including:

A. Define the Classes as pleaded herein and give notice to all potential class members in a form and manner to be determined by the Court upon Representative Plaintiffs' motion to certify the class;

B. Take any and all other appropriate steps to protect the rights of the Class Members as alleged herein;

C. Award declaratory and/or injunctive relief as pleaded herein;

D. Award general damages pursuant to common law and by statute (i.e., N.Y. Gen. Bus. Law §§ 349 and 350) for each Representative Plaintiff and Class Member as is established at the time of trial;

E. Award special damages pursuant to common law and by statute for each Representative Plaintiff and Class Member as is established at the time of trial;

F. Award punitive damages pursuant to common law and by statute for each Representative Plaintiff and Class Member as is established at the time of trial;

G. Award costs of suit, prejudgment and post-judgment interest, and attorneys' fees pursuant to New York General Business Law sections 349 and 350, or as otherwise allowed by law; and

H. Award such other relief in law or in equity as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Date:    February 17, 2021
         New York, NY

Respectfully submitted,

*/s/ Christopher K. Leung*

_____

Christopher K. Leung
Max E. Rodriguez
POLLOCK COHEN LLP
60 Broad St., 24th Fl.
New York, NY 10004
Tel.: (917) 985-3995
Email: Chris@PollockCohen.com

*Counsel for Plaintiffs and Proposed Class
Representatives Michelle Walls and N.W.*